UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Jan Katherine Burbage, | ) | |
| | ) | C/A No.: 4:14-cv-3237-BHH-TER |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| CAROLYN W. COLVIN, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42

U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social

Security, denying Plaintiff's claim for Disability Insurance Benefits (DIB). The only issues before the

Court are whether the findings of fact are supported by substantial evidence and whether proper legal

standards have been applied. This case was referred to the undersigned for a report and recommendation

pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

## I. RELEVANT BACKGROUND

### A.    Procedural History

On July 29, 2011, the Plaintiff filed an application for DIB alleging disability since April 2,

2004.[1] The claim was denied initially and upon reconsideration. (Tr. 105-111, 126-130, 113-125, 134-

136). A hearing was held by an Administrative Law Judge ("ALJ") on March 6, 2013. (Tr. 67-104). The

ALJ found in a decision dated April 5, 2013, that Plaintiff was not disabled. (Tr. 11-23). The Appeals

---

[1]Plaintiff's date last insured was December 31, 2009 (Tr. 11, 182). Plaintiff later amended her alleged disability onset date to her date last insured, namely December 31, 2009 (Tr. 11, 222).

Council denied Plaintiff's request for review making the ALJ's decision the Commissioner's final decision for purposes of judicial review. (Tr. 1-6). Plaintiff filed this action on August 12, 2014, in the United States District Court for the District of South Carolina.

**B.      Plaintiff's Background and Medical History**

**1.      Introductory Facts**

Plaintiff was born on October 26, 1955, and was 54 years old on the date last insured. (Tr. 21). Plaintiff has past relevant work experience as a network administrator. Plaintiff alleges disability due to fibromyalgia and related symptoms, confusion, memory loss, lack of concentration and emotional issues (Tr. 176, 181).

**2.      Medical Records and Opinions**

**a.      Records prior to the alleged onset date[2]**

On March 25, 2004, Plaintiff had a physical with her primary care physician, Dr. Bob Callis, M.D. Dr. Callis noted that he thought plaintiff "was probably depressed" and that depression was the reason she was unable to focus well at work. (Tr. 267). On April 6, 2004, Plaintiff indicated that she was having trouble concentrating. She said "she just wanted to get her brain back." Paxil was prescribed by Dr. Callis. (Tr. 268). On April 22, 2004, Plaintiff continued to indicate that she had difficulty concentrating. Plaintiff also complained of fatigue and not feeling well. (Tr. 268). On April 28, 2004, Plaintiff continued to complaint of fatigue and decreased concentration. A neurologist recommended a sleep study. Dr. Callis prescribed the sleep study and Lexapro. (Tr. 268). On May 19, 2004, Plaintiff reported that Lexapro made her more fatigued and depressed. She continued to have "brain fog" and fatigue. Dr. Callis thought that Plaintiff was probably depressed, but noted that

---

[2]A summary of these records is provided by way of background.

she could have chronic fatigue syndrome. (Tr. 268).

Also in May 2004, Dr. John Taylor completed a neuropsychologic consultative examination (upon referral of vocational rehabilitation) of Plaintiff. (Tr. 228-29, 269). She was administered the Vigil Continuous Performance Test, which was in the impaired range and her response latencies were long. (Tr. 228). Although Plaintiff had some problems with sustained attention, Dr. Taylor observed that she was fully oriented and had normal affect. Id. Her complex motor sequences were normal. (Tr. 228-29). On testing, she demonstrated a normal learning curve and had no issues with immediate or delayed recall. (Tr. 228). Dr. Taylor opined that Plaintiff's changes in memory were probably due to the effects of attention on encoding. He also felt Plaintiff suffered from depression, but did not assume this was the cause of her attentional impairment. He referred her for a neurological evaluation (Tr. 229).

Upon referral from Dr. Callis due to Plaintiff's complaints of snoring, fatigue, and short term memory loss, on May 28, 2004 Plaintiff went for an initial consult with Dr. Richard K. Bogan, M.D. at the Sleep Disorders Center. (Tr. 315-318). A subsequent sleep study revealed situational insomnia and mild positional obstructive apnea. (Tr. 319). On July 1, 2004, Dr. Bogan prescribed Ambien due to Plaintiff's history of difficulty initiating and maintaining sleep, frequent awakenings, and nonrestorative sleep. (Tr. 321).

On June 10, 2004, Plaintiff was seen again for complaints of memory impairment. Dr. Callis noted Plaintiff was tolerating Effexor and continued to prescribe it. Dr. Callis noted the findings of Dr. Taylor and referred her to vocational rehabilitation to see if they would send her to a neurologist. (Tr. 269). Dr. Callis noted that Plaintiff indicated that "she feels depression is lifting," and that it is "more situational due to memory impairment." (Tr. 269). On June 28, 2014, Plaintiff returned to see

3

Dr. Callis, and reported that she was still having a lot of problems with her memory and she had numerous trigger spots. Dr. Callis felt that "she is probably going to develop chronic fatigue syndrome or fibromyalgia." He continued her on Effexor and prescribed Wellbutrin. (Tr. 269). Dr. Callis saw Plaintiff again on July 2 and July 7, 2014. Her "problem" was noted to be "probable fibromyalgia." (Tr. 270). Plaintiff reported that the Effexor made her sleepy and Paxil was prescribed. On July 16, 2014, Plaintiff stated that the Paxil was not helping, so she was prescribed Prozac. (Tr. 270).

On July 15, 2004, Dr. Faber saw Plaintiff regarding her reports of increasing difficulty with concentration, comprehension and memory. Plaintiff indicated that she has been misplacing objects, had difficulty remembering names and numbers, and she left the utilities on inadvertently. (Tr. 234). On August 6, 2004, an EEG was normal and brain imaging showed no abnormality. Dr. Faber noted that he "suspect[ed] that she will not have any definable neurological process to explain her symptom complex. I suspect that depression plays a role but she would rather consider fibromyalgia as causative factor of her cognitive problems." (Tr. 233).

On August 4, 2004, Plaintiff had a consult with Dr. Boyd, M.D. Plaintiff indicated that "she had difficulty with my thinking and concentration. I wonder if I might have fibromyalgia." Dr. Boyd's impressions were: "(1) CNS dysfunction with memory problem of uncertain cause; (2) depression, sleep disturbance, atypical musculoskeltal symptoms and quite classic fibromyalgia-like tender points. It seems likely that she does have the symptomatology to support the diagnosis of fibromyalgia. I would be reluctant to blame her CNS dysfunction on this." Dr. Boyd told Plaintiff that there was no specialty care available for fibromyalgia. He advised correcting her sleeping disturbance, treating her underlying depression, and an exercise program such as water aerobics. (Tr. 322-324).

4

On August 10, 2004, Dr. Callis noted that plaintiff "is here today saying that she is comfortable with the diagnosis of fibromyalgia." Plaintiff wanted to get enrolled in water aerobics, and wanted a handicap sticker as she reported she had difficulty walking. Plaintiff was started on Synthroid for hypothyroidism. (Tr. 271). On August 16, 2014, Plaintiff stated there was no way she could function at her job. Dr. Callis referred her to physical therapy. Id.

An initial assessment with Shannon Wilson, MSN, in September 2004 reflected that Plaintiff did not believe she was depressed and that she was "doing okay." Plaintiff rated her depression and anxiety at only a "1" or "2" on a scale of "0-10," with "0" signifying no sense of depression or anxiety and "10" signifying hopeless depression or anxiety (Tr. 357).

On September 8, 2004, Dr. Callis and Plaintiff discussed her problems, and Dr. Callis suggested that Plaintiff return to her psychiatrist (Tr. 271).

On September 13, 2004, Plaintiff saw Dr. Darwin R. Boor, M.D. with Greenville Neurology Consultants. Dr. Boor examined Plaintiff and noted that she had a mildly reduced range of motion in her neck, mild to moderate facet tenderness, a slight loss of lumbar lordosis and mild paraspinal muscle fullness and tenderness. Dr. Boor opined that Plaintiff had a possible familial mixed connective tissue disease (vs. familial fibromyalgia). Dr. Boor concluded that "clinically Mrs. Burbage does not have fibromyalgia." (Tr. 326). Dr. Boor noted that Plaintiff had been seen by a rheumatologist who "favored" fibromyalgia. (Tr. 326-327). Dr. Boor noted that Plaintiff might benefit from a trial of Elavil. Dr. Boor also noted that Plaintiff had possible hypothyroidism. Dr. Boor further assessed possible encephalopathy and noted that neuropsychological testing only revealed problems with attention and depression, which could explain Plaintiff's neurocognitive problems. Dr. Boor also noted that hypothyroidism, severe obesity, sleep apnea, chronic pain, and

5

chronic insomnia could all produce similar findings. Plaintiff had a possible sensory neuropathy with sensory changes to pin prick and temperature. (Tr. 326-327).

Plaintiff returned to Dr. Boor on October 25, 2004 and reported unchanged symptoms. She continued to have problems with her memory, she was easily confused and easily bothered. Hypothyroidism was not supported by subsequent testing. A repeat polysomnogram and continued current therapies were recommended. (Tr. 328-329). It was noted that Plaintiff was not taking the Elavil.

On December 14, 2004, Plaintiff saw Dr. Kathleen P. Flint with Columbia Arthritis Center, who assessed Plaintiff with chronic widespread pain with disrupted sleep consistent with fibromyalgia. Dr. Flint noted that "Dr. Boyd's impression was that her symptoms were consistent with fibromyalgia but felt that hypothyroidism could mimic fibromyalgia. " (Tr. 331).  Plaintiff was noted to have a history of depression, but advised that she was not depressed at present. Tr. 331-332). Dr. Flint felt Plaintiff's cognitive symptoms were related to either depression, chronic pain, or sleep disruption, not an actual CNS change. Dr. Flint recommended a trial of Flexeril. (Tr. 333).

On December 27, 2004, Plaintiff returned to see Dr. Callis and discussed her recent visits with other physicians. Plaintiff indicated that she could not function. (Tr. 272). It was noted that a short term disability form was completed.

On January 10, 2005, Dr. Callis indicated that he has a "long discussion with [Plaintiff] on disability and fibromyalgia.[3] Brought up to date on what consultants were saying. She is very sincere.

---

[3]On January 25, 2005, the medical board (of the the Couth Carolina Retirement System) approved Plaintiff's claim for disability retirement (Tr. 164). On February 11, 2008, the medical board found no significant medical improvement related to Plaintiff's claim and the board recommended that disability benefits continue through January of 2011. Plaintiff's treating physician indicated that she was anxious, depressed, and had poor attention as well as poor

Just has a real problem with her thought function, her cognitive function, and spelling. Could not spell [the word] "arrange." (Tr. 272).

On March 13, 2006, Dr. Callis wrote that Plaintiff was not thinking well and she was dropping things. He indicated that she "now has some depression," and assessed fibromyalgia with insomnia and pain. She was prescribed ibuprofen, Cymbalta, and Lunesta.

On July 3, 2006, Plaintiff was noted to be quite emotional and with erratic moods, which Dr. Callis thought was from depression. He noted that Plaintiff brought in a high TSH from the Arthritis center of Tallahassee. Dr. Callis assessed subclinical hypothyroidism and mood swings probably secondary to depression. Plaintiff was prescribed Celexa and Wellbutrin (Tr. 273).

On August 1, 2007, Plaintiff reported fatigue. Dr. Callis wrote that Plaintiff had fibromyalgia and chronic fatigue syndrome. It was noted that Plaintiff slept poorly, but that she felt she could not use anything for sleep because she had to wake up during the night if her epileptic husband had a seizure, which required her to wake up, help him to the bathroom, and prevent him from falling off the bed. Dr. Callis assessed that Plaintiff "almost has a shift work type problem." (Tr. 274).

On October 19, 2007, Plaintiff was seen by Dr. Callis for impingement syndrome of her left shoulder.

On November 9, 2007, Plaintiff was treated for left shoulder pain by Dr. McGowan at

---

memory skills. The treating physician indicated that Plaintiff had a moderate to severe mental impairment. (Tr. 167-168). On February 3, 2011, the medical board found that Plaintiff was still being treated for fibromyalgia. The treating physician indicated that her thought processes were slowed and she had a flat affect with poor attention span and a poor memory. The medical board determined that Plaintiff should continue to receive retirement benefits. The board found medical improvement was unlikely and they did not anticipate that Plaintiff would need to provide medical evidence of continuing disability in the future (Tr. 65-66).

Lexington Orthopaedics. She was prescribed Vicodin. It was noted that Plaintiff was having a lot of crying spells and she was going to work on finding a psychiatrist (Tr. 257). On November 19, 2007, Plaintiff reported to Lexington Orthopaedics that she had problems reaching overhead and behind her back and sleeping on her left side. X-rays showed some subacromial spurring. She received a cortisone injection for her shoulder. (Tr. 255-256). She was referred to a specialist regarding her fibromyalgia (Tr. 255).

On November 16, 2007, Plaintiff reported to Dr. Callis that she had pain over her sciatic nerve on the left side. She was prescribed Vicodin and a Lidoderm patch. On December 20, 2007, Dr. Callis saw Plaintiff for fibromyalgia and hypothyroidism. She was still experiencing forgetfulness, diffuse aching, and lack of energy. Upon inquiry, she was given the name of a counselor (Tr. 274).

In January 2008, Plaintiff visited Dr. Bonnie Ramsey for a psychiatric evaluation at the request of the South Carolina Vocational Rehabilitation Department (Tr. 244-47). Plaintiff denied experiencing major depressive disorder symptoms and indicated that while she had tried antidepressants in the past, she had taken them to address "brain fog" (Tr. 244). She noted that there were days when she was not depressed and that her self-esteem was good (Tr. 245). Dr. Ramsey observed during her mental status examination that Plaintiff was alert and fully oriented (Tr. 245). She could spell the word "world" forwards and backwards. Id. Dr. Ramsey noted that, while Plaintiff had "some minimal problems" concentrating, her objective examination yielded no significant symptoms (Tr. 246). Dr. Ramsey assessed her with "no psychiatric diagnosis" and noted fibromyalgia only "by self-report" (Tr. 247).

That same month, Plaintiff visited Dr. William Odom, who summarized her fibromyalgia

symptoms and then provided her with treatment options (Tr. 262).Dr. Odom wrote that Plaintiff had suffered a rather downward spiral with fatigue and diffuse pains, and her mental fog had become incapacitating. Dr. Odom had to repeat himself several times during the interview process. Plaintiff had 18 out of 18 tender points. Plaintiff had read the fibromyalgia brochure, but could not retain any of the information contained in the brochure. Dr. Odom recommended Nystatin and several different supplements (Tr. 262). However, Plaintiff was "extremely skeptical" of Dr. Odom's advice, prompting Dr. Odom to emphasize: "I'm not quite certain this patient has any desire whatsoever to get better." Id. (underlining in original).

On January 20, 2008, Dr. Callis completed a form in which he indicated that Plaintiff had been diagnosed with chronic fatigue syndrome. Psychiatric care had been recommended. Plaintiff had a slowed thought process, an anxious and depressed mood, poor attention/concentration and memory. Dr. Callis indicated that Plaintiff exhibited moderate to severe work related limitations in function due to a mental condition. (Tr. 334).

On June 12, 2008, Plaintiff returned to Dr. McGowan with shoulder pain. She had tenderness over the anterolateral border of her scapula as well as the medial border (Tr. 252). Dr. McGowan did note that she had a much improved range of motion in her shoulder. (Tr. 252).

On September 26, 2008, Plaintiff saw Dr. Callis, and requested Trazodone to help her sleep after communicating with a friend who used that to help her sleep. Trazadone was prescribed. (Tr. 275).

On January 2, 2009, Plaintiff indicated that she was having trouble staying asleep. She tried Trazadone. She wanted to try Flexeril as she had tried Ambien in the past but found it did not work. On January 30, 2009, Plaintiff reported that Flexeril made her too sleepy. Dr. Callis prescribed Mobic and Soma.

On May 18, 2009, Dr. Callis observed that, although fibromyalgia limited Plaintiff's ability to function, she was "[g]enerally healthy." Lexapro was "knocking her out" and making her fatigued, so she was going to try only a half tablet. (Tr. 276). He recommended that she continue to take Lexapro, an anti-depressant, and return in 6 months. Id.

> b.    Records after the alleged onset date, but also after the alleged date last insured

On February 8, 2010, Plaintiff complained to Dr. Callis of pain in her wrist. Plaintiff was assessed with tenosynovitis. (Tr. 277). Thereafter on April 1, she returned with wrist pain and was referred to orthopaedics.

On April 8, 2010, Plaintiff went to Lexington Orthopaedics with reports of right wrist pain. She was diagnosed with (mild) De Quervain syndrome (Tr. 260).

A year later, in May 2010, Plaintiff told Dr. Callis that she felt fatigued, but also acknowledged at the same time that she was not exercising in accordance with Dr. Callis' recommendation (Tr. 277). Nevertheless, her physical examination was normal. Id. Dr. Callis observed that Plaintiff was "coping fairly well" with fibromyalgia. Id.

On January 28, 2011, Dr. Callis indicated that Plaintiff suffered from "fibro fog" and her thought process was slowed. She had a flat mood/affect, and her attention/concentration and memory were poor. It was indicated that Plaintiff had "obvious" work-related limitations due to the "fibro fog," which accompanied fibromyalgia and was a slowing of the thought process along with memory problems (Tr. 60).

On June 3, 2011, Dr. Callis wrote that Plaintiff still had diffuse pain, fatigue, and she was not thinking well. She had fibromyalgia, which had rendered her unemployable (Tr. 289).

On August 23, 2011, Dr. Timothy Laskis completed a Mental Residual Functional Capacity

Assessments and found Plaintiff's depression to be considered a non-medically determinable impairment (Tr. 107).

On September 27, 2011, Dr. Robert Kukla completed a Physical Residual Functional Capacity Assessments and determined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, and stand, walk, and sit about 6 hours. She could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. She could occasionally climb ladders, ropes, and scaffolds (Tr. 108-109).

On March 12, 2012, Dr. Rebecca Meriwether completed a Physical Residual Functional Capacity Assessments and determined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, and stand, walk, and sit about 6 hours. She could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. She could occasionally climb ladders, ropes, and scaffolds. (Tr. 113-123).

On March 20, 2012, Dr. Edward Waller determined that there was insufficient evidence to rate Plaintiff's mental impairment at the date last insured (Tr. 118).

On March 20, 2012, Dr. Callis agreed with Plaintiff's husband that Plaintiff had some obsessive compulsive tendencies. She was resistant to taking antidepressants since she had tried them in the past. It was noted that Plaintiff was not sleeping during the night because she woke up to go to the bathroom. (Tr. 352).

On May 31, 2012, Plaintiff saw Dr. Mark Lencke, MD, at the South Carolina Neurological Clinic. Plaintiff reported worsening cognitive problems over the last eight years. She had problems keeping up with housework, paying bills, and driving. Dr. Lencke's impression was that Plaintiff had pseudodementia rather than an underlying dementia or neurologic illness. He recommended that she

follow up with a neuropsychologist for testing and/or neurocognitive treatment (Tr. 336).

On August 11, 2012, Dr. Callis wrote that Plaintiff fibromyalgia (fibro fog). Her thought process was slowed and her attention/concentration and memory were poor. She had "obvious" work-related limitations in function. (Tr. 302). She did not concentrate well and her memory was not good. Id.

On September 24, 2012, Dr. Robert E. Hooper with Columbia Counseling Center performed a clinical evaluation. The results of his interview and the outcome of the Connor's rating scale gave evidence for the diagnosis of attention deficit/hyperactivity disorder. Plaintiff had the predominately inattentive type. Her scores and clinical report placed her in the moderate range of severity. Manifestation included disorganization, forgetfulness, non-completion of tasks, reading comprehension deficits, decreased concentration, and reduced attention to detail. A trial use of medication to address the attention deficit issues appeared warranted. Plaintiff's presentation also suggested a moderate level of mood depression. She reported she had numerous trials with anti-depressants. It was noted that mood depression could contribute to Plaintiff's reduced attention and focus levels (Tr. 338).

On October 2, 2012, Plaintiff told Dr. Callis that a psychologist had diagnosed her with attention deficit disorder and depression (Tr. 343). Dr. Callis noted that in the past Plaintiff had been "resistant to the idea of being depressed." (Tr. 343). On October 8, 2012, Wellbutrin was changed to Concerta (Tr. 341).

### C.     The Administrative Proceedings

#### 1.     The Administrative Hearing

a.     Plaintiff's Testimony

12

At the hearing, Plaintiff's representative amended the alleged onset date to December 31, 2009 (Tr. 70). The ALJ and the representative discussed a prior period of disability as determined by the state of South Carolina through Vocational Rehabilitation. Plaintiff had been found disabled as of April 2004 through South Carolina Retirement System (Tr. 70-74). The ALJ asked if Plaintiff was seeing a psychiatrist in 2011, but Plaintiff did not remember if she had or not (Tr. 75-77).

Plaintiff testified that she became disabled on December 31, 2009. She was born on October 26, 1955. She was 57 years old at the time of the hearing. She lived in a house with her husband. She was 5'5" and weighed 202 pounds. She was right-handed. Her husband did not work. Her income came from the state retirement benefits. She had a driver's license and she drove two or three times a week. She drove to the hearing. Plaintiff had a degree in applied mathematics and she had taken some programming classes associated with her work (Tr. 78-81).

Plaintiff worked for Sinkler and Boyd in 1998. It was a part-time job setting up computers and installing software or hardware. She was also the network administrator for Lexington County. Initially she worked for one department, but she was transferred to be a network administrator for the entire county. She was promoted to a programmer's position prior to retirement (Tr. 81-82).

The ALJ asked about Plaintiff's prescriptions. She was taking Synthroid for her thyroid and also for memory problems. Plaintiff had taken lots of medications in the past, but she had reactions to them. She either had severe reactions or they put her to sleep. Plaintiff could not remember the name of one medication that she tried, but it caused sweating, vomiting, and cramping. Plaintiff's husband called the pharmacist in the middle of the night and the pharmacist said those were possible side effects, but he had not heard of anyone having them so severely. Plaintiff did not go to the hospital because her husband could not drive. Plaintiff did not remember when that happened (Tr.

13

82-84).

The representative asked Plaintiff why she did not apply for disability earlier. Plaintiff stated that she did not file right away because she was still looking for some way to go back to work as a computer programmer. She was looking for someone that could help her retain her brain functions. She was optimistic that she would be able to work, and she had heard that it was difficult to get disability benefits. Plaintiff tried to find out what was wrong with her and was afraid that it was Alzheimer's. Before leaving her job, Plaintiff testified that she just stared at the walls and she could not concentrate. She would see her name on things and not understand it. She went to several doctors to try to figure out what was wrong. Dr. Boyd first diagnosed her with fibromyalgia, and Dr. Flint confirmed the diagnosis. They are both rheumatologists. Plaintiff was relieved it was not Alzheimer's, but her memory problems had not improved since her diagnosis. Plaintiff's husband had written a statement about how Plaintiff had been able to do things socially, but she was no longer able to do them. Her social issues had worsened. She was no longer able to knit. Plaintiff had not showered in over a week. She stayed in her bed clothes most of the time (Tr. 85-88).

The representative noted that Plaintiff's records referenced her fatigue and her need for rest. She was able to do things in spurts. Plaintiff testified that she spent at least 75% of the day resting. Fatigue was her primary physical problem. Plaintiff's husband did not drive because he had epilepsy. Plaintiff drove, but her husband wrote in his statement that Plaintiff had problems driving due to problems with concentration or attention. For example, Plaintiff treated a light at the intersection as if it was a stop sign. The light was near her house and was something that should have been familiar to her, but she stopped at a green light because she was treating it like a stop sign. She also got lost. She could not remember how to get from the hospital to her mother's house. Plaintiff did not know

14

how often this happened. She had problems knowing if she was missing something when she was driving (Tr. 88-90).

The ALJ asked Plaintiff if she remembered a mental exam in January of 2008 with Dr. Bonnie Ramsey. Plaintiff remembered it as the state review. Dr. Ramsey had indicated that Plaintiff did not have mental problems, but she did have problems with memory. Plaintiff had tried medications for depression and she had recently been diagnosed with moderate attention deficit disorder. Plaintiff did not think she was depressed, but she was thinking of situational depression and did not understand how she could be depressed if she had a good job and a good marriage. Her main problems were fatigue and memory problems and they interfered with her ability to work (Tr. 91-94).

Plaintiff testified that one issue she had not mentioned was her fibrofeet. She had a hard time walking on cement and she could not stand for long on concrete floors. It hurt her to have to walk to the back of Wal-Mart to get milk (Tr. 102).

  b.  Vocational Evidence

A vocational expert (VE) also testified at the hearing (Tr. 26-103). The VE classified Plaintiff's past work as that of a network administrator at the light level of exertion, SVP of 6, DOT of 031.262-014. The job did not generate skills that were readily transferable to the sedentary level (Tr. 95).

The AL proposed the following hypothetical:

> Assume an individual of the claimant's age, education and past work experience and impairments of fibromyalgia. The individual was limited to lifting and/or carrying 50 pounds occasionally, 25 pounds frequently, standing, walking and sitting about 6 hours, occasionally climbing ladders, ropes, and scaffolds, and frequently climbing ramps, stairs, balancing, stooping, kneeling, crouching, and crawling (Tr. 95).

The VE testified that the individual would not be able to perform Plaintiff's past work. The

15

individual would be able to perform work at the medium level of exertion, such as produce packer, SVP of 2, DOT of 920.687-130, with 872,000 jobs nationally and 20,000 jobs regionally; laboratory aid, SVP of 2, medium, DOT of 381.687-022, with 2,000,000 jobs nationally and 40,000 jobs regionally; and patient escort transporter, medium, SVP of 2, DOT of 355.677-014, with 182,000 jobs nationally and 2,000 jobs regionally. The ALJ asked the VE why the individual could not perform Plaintiff's past work. The VE stated that Plaintiff's past work had a higher skill level. The ALJ said that the hypothetical did not include skill level. The VE responded that the hypothetical individual could perform Plaintiff's past relevant work (Tr. 95-96).

> The ALJ proposed a second hypothetical:
>
> Assume a hypothetical individual with same vocational factors and the same impairments with limitations of lifting and/or carrying 20 pounds occasionally, 10 pounds frequenting, standing, walking and sitting about six hours, never climbing ladders, ropes, scaffolds; occasionally climbing ramps, stairs, and frequently balancing but occasionally stooping, kneeling, crouching, and crawling (Tr. 97).

The VE stated that the hypothetical individual could perform Plaintiff's past relevant work.

> The ALJ proposed a third hypothetical:
>
> Assume a hypothetical individual with the same impairments as hypothetical individual number two. Assume a hypothetical individual of the claimant's age, education, and past work experience with the impairments of fibromyalgia and reduced memory with the following limitations: lift and or carry 20 pounds occasionally, 10 pounds frequently; stand, walk, and sit about six hours, never climb ladders, ropes, or scaffolds, frequently balance, occasionally climb ramps, stairs, stoop, kneel, crouch, and crawl, and limited to unskilled work (Tr. 97-98).

The VE stated that the individual could not perform Plaintiff's past relevant work. Other jobs that the individual could perform were work ticket distributor, SVP of 2, DOT of 221.667-010, with 281,000 jobs nationally and 5,000 jobs regionally; stock checker or merchandise marker, DOT of 229.587-018, with 1,000,000 jobs nationally and 30,000 jobs regionally, SVP of 2; and a dry cell

assembler, light, SVP of 1, DOT of 692.686-066, with 100,000 jobs nationally and 800 to 900 jobs regionally (Tr. 98-99).

The ALJ proposed a fourth hypothetical:

Assume a hypothetical individual with the same vocational factors and impairments as in hypothetical number three, except the individual is limited as stated in claimant's testimony, considering all testimony to be credible.

The VE stated that the hypothetical individual would not have the memory capacity to perform work at even the simplest level in the competitive industry (Tr. 99). The VE reported that her testimony was consistent with the DOT.

The representative asked the VE about the second and third hypotheticals. Specifically, the representative inquired if the testimony regarding the amount of rest that Plaintiff she would need was credible, would that affect the individual's ability to do any of the jobs. The VE stated that the individual would not be able to maintain full-time employment (Tr. 100-101).

### **2.    The ALJ's Decision**

In the decision of April 5, 2013, the ALJ found the following:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2009.

2.    The claimant did not engage in substantial gainful activity during the period from her amended alleged onset date of December 31, 2009, through her date last insured of December 31, 2009 (20 CFR 404.1571, *et seq*.).

3.    Through the date last insured, the claimant had the following severe impairments: fibromyalgia and decreased memory. (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR

Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for the following limitations: no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; no standing and/or walking over 6 hours in an eight hour workday; no climbing of ladders, ropes, or scaffolds, no more than occasional climbing of stairs or ramps, no more than frequent balancing; no more than occasional stooping, kneeling, crouching or crawling; and only unskilled work.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on October 26, 1955 and was 54 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564)

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from December 31, 2009, the amended alleged onset date, through December 31, 2009, the date last insured (20 CFR 404.1520(g)).

(Tr. 11-23).

18

## II. DISCUSSION

The Plaintiff argues that the ALJ erred in his decision, and requests that the decision of the Defendant be reversed and remanded for an award of benefits, or in the alternative, remanded for additional administrative proceedings. (Pl. Br. at 2). Specifically, Plaintiff raises the following arguments in her brief, quoted verbatim:

> I.    The ALJ rationale in evaluating evidence prior to the amended alleged onset date is not substantially justified.
>
> II.    The ALJ did not perform the analysis of the treating and evaluating physician opinions required by 20 CFR §404.1527(d)(1)-(6), SSR 96-2p and SSR 96-5p.
>
> III.    The ALJ incorrectly dismissed the Plaintiff's mental impairments of depression and attention deficit disorder as non-severe.
>
> IV.    The ALJ failed to properly evaluate Burbage's credibility.

(Plaintiff's brief).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that it should therefore be affirmed.

### A.         LEGAL FRAMEWORK

### 1.    The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated

under the Act have reduced the statutory definition of disability to a series of five sequential questions.

See, e.g., Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents him from doing SGA. See 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R.

---

[4]The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); see Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5]In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d) (5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir.2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. Hall v. Harris, 658 F.2d 260, 264–65 (4th Cir.1981); see generally Bowen v. Yuckert, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. See id.; Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Walls, 296 F.3d at 290 (citing Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." Vitek v. Finch, 438 F.2d 1157, 1157–58 (4th Cir.1971); see Pyles v. Bowen, 849 F.2d 846, 848 (4th Cir.1988) (citing Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson,

402 U.S. at 390, 401; Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir.2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. See Vitek, 438 F.2d at 1157–58; see also Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir.1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir.1972).

**B.    ANALYSIS**

The Court will address the third issue raised by Plaintiff, first.  Plaintiff alleges that the ALJ erred by not finding that Plaintiff's mental impairments of depression and attention deficit disorder were severe impairments.  Plaintiff argues, in essence, that the ALJ's Step Two analysis is not supported by substantial evidence.

Step Two of the sequential evaluation requires the ALJ to "consider the medical severity of [a claimant's] impairment(s)." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The claimant bears the burden at this step to show that he has a severe impairment. See Bowen v. Yuckert, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). "Basic work activities" means "the abilities and aptitudes necessary to do most jobs." Examples of these include:

(1)    Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2)    Capacities for seeing, hearing, and speaking;
(3)    Understanding, carrying out, and remembering simple instructions;
(4)    Use of judgment;
(5)    Responding appropriately to supervision, co-workers and usual work situations; and
(6)    Dealing with changes in a routine work setting.

22

20 C.F.R. §§ 404.1521(b), 416.921(b). "[A]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir.1984) (emphasis in original) (internal quotation marks omitted).

At step two of the sequential evaluation process, the ALJ found Plaintiff's fibromyalgia and decreased memory were severe impairments. (Tr. 13). *See* 20 C.F.R. § 404.1520(a)(4)(ii). The ALJ specifically considered Plaintiff's depression, de Quervain's syndrome, left shoulder impingement/bursitis, benign positional vertigo, hypothyroidism, right clavicle tendonitis, obstructive sleep apnea, obesity, insomnia, asthma, and attention deficit disorder in the following discussion:

> These impairments are well managed with appropriate care and treatment and/or fail to produce more than a minimal effect on the claimant's ability to perform basic work activities. Therefore, these do not qualify as "severe" impairments.

(Tr. 14-17).

As noted, pursuant to 20 C.F.R. § 404.1521, an "impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." For an alleged impairment to be found severe, Plaintiff must show that it is more than merely a "slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." *Social Security Ruling,* 85-28, 1985 WL 56856, at *3. The focus of the analysis must be on the limitations caused by the impairment, not the mere existence of an impairment. Here, the evidence fails to show that Plaintiff experienced any credible functional limitations as a result of any her non-severe impairments, but specifically her depression and attention deficit disorder.[6]

---

[6]Plaintiff primarily focuses on these two non-severe impairments in her brief.

23

As for Plaintiff's non severe impairment of depression, the medical records show that Plaintiff took anti-depressants, her affect was normal on numerous occasions, and, ultimately, she experienced no significant problems with that condition (Tr. 228, 269, 244-45, 247, 357). Plaintiff herself indicated to several of her doctors that she was not depressed (Tr. 244-45) (denying experiencing major depressive disorder symptoms and noting that there were days she was no depressed and her self-esteem was good), (Tr. 269) ("she feels depression is lifting" and it is "more situational"), (Tr. 332) ("Says she is not depressed at present."), (Tr. 357) (stating that she did not believe she was depressed and she was "doing okay"). As of September 2004, Plaintiff noted that her depression ranked at "1" or "2" on a scale of "0-10." (Tr. 357). Dr. Ramsey declined to give Plaintiff any psychiatric diagnosis. (Tr. 247). Moreover, despite visiting Dr. Callis over the course of at least seven years, his records do not reflect any significant complaints of depression.

As for Plaintiff's ADD, the record is sparse concerning that condition, as well. Notably, Plaintiff was diagnosed with ADD, after a one time consultation in September 2012, which is after the relevant time period. (Pl. Br., ECF No. 18 at 30; Tr. 338). Records from before Plaintiff's date last insured demonstrated that, despite her complaints of problems paying attention, the consultative report from Dr. Ramsey shows "considerably less limitation in attention . . . than that reported by the claimant" (Tr. 20). See also (Tr. 228-29) (Plaintiff had no issues with immediate or delayed recall), (Tr. 326) (mental state is within normal limits), (Tr. 245) (showing that Plaintiff was alert, fully oriented, and only had minimal problems with concentration in word finding with no significant symptoms evident), (Tr. 328) ("Grossly normal orientation, memory, concentration, cognition, and language."). Further, Plaintiff performed a wide range of tasks that were inconsistent with her claim of experiencing a severe deficit in attention: such as taking care of her epileptic husband and

administering his medications, driving a car, and shopping (Tr. 80, 246).

Plaintiff fails to identify any functional limitations she experiences as a result of these conditions that the ALJ did not already account for in his RFC assessment, or appropriately discount in his analysis.[7] Based on the record presented, substantial evidence supports the ALJ's finding that these impairments are not severe. Even assuming arguendo that either of these two impairments should have been considered a "severe" impairment, the ALJ's failure to so find is harmless given that he proceeded onto the next steps in the sequential evaluation process. It is well settled that the omission of an

---

[7]The Court is cognizant of the recent Fourth Circuit decision in Mascio v. Colvin, 780 F.3d 632 (2015)(ALJ does not account "for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work."). In the instant case, the ALJ concluded at step that Plaintiff's depression and attention deficit hyperactivity disorder were non-severe impairments which failed to produce more than a minimal effect on the claimant's ability to perform basic work activities. At step three, in considering Plaintiff's mental impairments, singly and in combination, the ALJ concluded that the Plaintiff had moderate difficulties with regards to concentration, persistence and pace. He subsequently clarified that the evidence established "no more than moderate limitation in this area." The ALJ continued on to formulate a RFC, which did not contain any specific limitations with regards to concentration, persistence and pace, other than a limitation to unskilled work. However, the decision as a whole indicates that the ALJ did not find that any concentration, persistence, or pace limitation affected claimant's ability to work. In discussing the medical evidence the ALJ noted that an evaluation from Dr. Taylor showed that the claimant had largely intact memory, attention and concentration. (Tr. 17). Further, the ALJ noted that Dr. Ramsey did not make any psychiatric diagnosis as a result of his January 2008 psychiatric consultative examination, and concluded that Dr. Ramsey's report shows considerably less limitation in attention, concentration and memory than that reported by Plaintiff. (Tr. 17, 20). In evaluating Plaintiff's alleged symptoms and limitations, including purported deficits in attention and concentration, the ALJ found claimant's allegations to be "unpersuasive and incredible." (Tr. 19). The ALJ again noted that the record shows no more than moderate limitation in the area of maintaining concentration, persistence, and pace limitation, and noted that despite reporting significant memory loss, claimant was able to drive, and had never been prohibited from doing so by her primary care physician, which the ALJ found suggested that Dr. Callis did not considered this issue to be significant. (Tr. 19). Additionally, the ALJ found that the spectrum of daily activities that the record established Plaintiff engaged in was inconsistent with the limitations that Plaintiff professed. For these reasons, the ALJ's decision does not run afoul of the holding in Mascio.

25

impairment at step two is harmless if the ALJ resolves that step in the claimant's favor and considers any limitations from that impairment at the subsequent steps in the sequential evaluation. Washington v. Astrue, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (holding that there is "no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps"); Singleton v. Astrue, No. 9:09-cv-1982, 2009 WL 1942191, *3 (D.S.C. July 2, 2009) (holding that even "were the court to agree that Plaintiff's depression should have been found 'severe' at step two, any error would be harmless because if Plaintiff makes a threshold showing of any 'severe' impairment, the ALJ continues with the sequential evaluation process and considers all impairments, both severe and nonsevere."). In this case, the ALJ did not deny benefits at step two. Rather, he found that Plaintiff had severe impairments and continued on to the subsequent steps of the sequential evaluation process (Tr. 19-27). Furthermore, the ALJ specifically noted that he considered all of Plaintiff's symptoms and the whole record – not just her severe impairments – when he determined her ability to perform work-related activities (Tr. 16-17, 18) . Plaintiff argues that her depression and ADD contributed to her problems concentrating and paying attention. (Pl. Br., ECF No. 18 at 30). Even though the ALJ found that Plaintiff's depression and ADD were not severe, the ALJ still analyzed those symptoms in evaluating whether Plaintiff qualified for a listing (Tr. 15) (discussing concentration issues) and in fashioning Plaintiff's RFC (Tr. 17-21) (discussing the evidence concerning her abilities to pay attention and concentrate). Thus, the ALJ accounted for all of Plaintiff's impairments, including those she deemed non-severe, in her analysis. For these reasons, the ALJ's Step Two findings are supported by substantial evidence.  Even assuming, arguendo, error, any such error is harmless.

Plaintiff's next allegation of error is that the ALJ erred in his evaluation of the treating physicians' medical opinions. The Social Security Administration's regulations provide that

"[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c).

Generally, more weight is given to the opinions of examining physicians than non-examining physicians.

More weight is given to the opinions of treating physicians since they are more likely to be able to

provide a detailed, longitudinal picture of a claimant's medical impairment. See 20 C.F.R. §§ 404.1508

and § 404.1527(c)(2). The medical opinion of a treating physician is entitled to controlling weight, i.e.

it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20

C.F.R. § 404.1527(c)(2), SSR 96-2p, and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y

negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded

significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances,

"the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of

persuasive contrary evidence." Mastro, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2 31, 35 (4th

Cir. 1992)).

In determining what weight to give the opinions of medical sources, the ALJ must apply all of

the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the claimant;

whether the source has a treatment relationship with the claimant and, if so, the length of the relationship

and the frequency of examination; the nature and extent of the treatment relationship; the supportability

and consistency of the source's opinion with respect to all of the evidence of record; whether the source

is a specialist; and, other relevant factors. See SSR 96-2p; Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir.

2006).  Furthermore, 20 C.F.R. § 404.1527(c)(2) states: "[w]e will always give good reasons in our

notice of determination or decision for the weight we give your treating source's opinion." SSR 96–2p

requires that "the notice of the determination or decision must contain specific reasons for the weight

given to the treating source's medical opinion, supported by the evidence in the case record, and must

be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

Plaintiff asserts that the opinions of Doctor Callis supports a finding of disability, and that the ALJ did not provide logically or legally supported reasons for discounting Doctor Callis' opinions. Regarding Dr. Callis's opinions, the ALJ found as follows:

> As for the opinion evidence, on a number of occasions, including January 20, 2008, January 28, 2011, and August 11, 2011, Dr. Callis indicated that the claimant's impairments result in obvious and/or moderate to sever work related limitation in function. On June 3, 2011, he also opined that the claimant's fibromyalgia renders her unemployable. However, the medical evidence of record fails to provide support for these opinions. Moreover, Dr. Callis did not reference specific objective signs or diagnostic findings. Additionally, these opinions were rendered outside of the period in question, given the amended alleged onset date. In addition, the consultative examination report from Dr. Ramsey shows considerably less limitation in attention, concentration, and memory than that reported by the claimant. Dr. Callis apparently relied heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true, most if not all, of what the claimant reported.  Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. Given this, I find that the opinion evidence of Dr. Callis is entitled to little evidentiary weight.

(Tr. 20).

This Court finds that there is substantial evidence to support the ALJ's findings in regards to Dr. Callis opinions. As an initial matter, Dr. Callis' statement in his June 3, 2011, treatment note that Plaintiff was "unemployable" was not entitled to any significant weight (Tr. 20-21, 289). Opinions about "findings that are dispositive of the case, i.e., that would direct the determination . . . of disability," such as Dr. Callis' opinion that Plaintiff is "unemployable," are explicitly reserved to the Commissioner and are not entitled to any special deference. 20 C.F.R. § 404.1527(d)(1), (3); Thompson v. Astrue, 442 F. App'x 804, 808 (4th Cir. 2011) ("Such opinions are not afforded any special significance."). Thus, the ALJ properly discounted Dr. Callis' opinion on the ultimate issue of whether Plaintiff could work.

28

Substantial evidence also supports the ALJ's discounting of the remainder of Dr. Callis' opinions. In January 2008, January 2011, and August 2011, Dr. Callis stated, without any citation or reference to medical evidence, that Plaintiff had obvious or moderate-to-severe work-related functional limitations (Tr. 302, 334-35). Yet, as the ALJ explained, Dr. Callis provided no support for these opinions (Tr. 20). *See* 20 C.F.R. § 404.1527(c)(3) (where opinion is not supported, the ALJ may give it less weight). As noted by the ALJ, nearly all of Dr. Callis' treatment notes merely memorialized Plaintiff's own subjective complaints — without any objectivity or medical findings whatsoever (Tr. 20). It is well-established that a claimant's subjective complaints to her doctor are not medical opinions deserving of any special weight. See, e.g., Smith v. Colvin, No. 12-3588, 2014 WL 1159056, at *3 (D.S.C. Mar. 20, 2014). Dr. Callis' own notes do not provide support for his opinion about Plaintiff's functional abilities. *See Hawley v. Colvin*, No. 12-260, 2013 WL 6184954, at *4 (E.D.N.C. Nov. 25, 2013) (the fact that a doctor's opinion "was not supported by his own treatment notes was a sufficient reason in itself for discounting the treating physician's opinion"). Despite Plaintiff's subjective complaints to him, Dr. Callis noted that Plaintiff's fatigue could be due, not to her own conditions, but rather to her epileptic husband having seizures and waking her up at night (Tr. 274). Dr. Callis indicated that Plaintiff seemed to being having "a shift work type problem." Id.  In May 2009, Dr. Callis observed that Plaintiff was a "generally healthy female with fibromyalgia, which limits her ability to function" (Tr. 276). A year later in May of 2010, Plaintiff's physical examination was unremarkable, and Dr. Callis noted that she was "coping fairly well" with fibromyalgia. (Tr. 277).

Dr. Callis' opinion is also not supported by the other medical evidence of record. (Tr. 20). *See* 20 C.F.R. § 404.1527(c)(3), (4) (where physician's opinion is not supported and/or inconsistent

with the rest of the record, ALJ may afford it less weight). As early as 2004, several doctors expressed skepticism toward diagnosing her with fibromyalgia (Tr. 326) ("Clinically Mrs. Burbage does not have fibromyalgia."), (Tr. 331) ("Dr. Boyd's impression was that her symptoms were consistent with fibromyalgia but felt that hypothyroidism could mimic fibromyalgia."). Examinations showed that her neurological system was within normal limits with normal reflexes; she had no swelling, clubbing or deformity in her arms or legs; she had full strength in her motor system, arms, and legs; she could get on and off a table and out of a chair with no difficulty; her stance and gait were normal; and, mentally, her affect, memory, concentration, and orientation were normal (Tr. 317, 321, 323, 326, 328, 332). In addition, she denied experiencing mental health problems on numerous occasions (Tr. 244, 269, 332, 357). In January 2008, Dr. Ramsey's psychiatric evaluation yielded unremarkable results: at most, she had "some minimal problems" concentrating and, upon examination, she showed no significant symptoms (Tr. 246). Dr. Ramsey afforded her "no psychiatric diagnosis" (Tr. 247). That same month, after Plaintiff was skeptical at following a medically-recommended course of treatment for fibromyalgia, Dr. Odom stated that he was "not quite certain this patient has any desire whatsoever to get better" (Tr. 262).

Finally, the ALJ noted that Dr. Callis' issued his opinions outside the period at issue in this case, namely December 31, 2009, which was Plaintiff's alleged disability onset date and her date last insured (Tr. 20).[8] Substantial evidence supports the ALJ's finding that Dr. Callis' opinions should

---

[8]The initial issue raised by Plaintiff concerns the ALJ's evaluation of the evidence outside of the relevant time period, and specifically Dr. Callis January 20, 2008 opinion. See Pl. Br. at 22. Plaintiff also "observes" that, if the date last insured were not an issue in this case, she would be considered disabled as of her 55th birthday (Pl. Br., ECF No. 18 at 21). Plaintiff's position is inapposite however, because the date last insured is the statutory cut-off for her DIB claim. Additionally, Plaintiff, through her representative, amended her alleged onset date from April 2, 2004, to December 31, 2009 (Tr. 11, 222). The ALJ carefully considered all of the

be afforded little weight.

Plaintiff argues that the ALJ's analysis is unsupported because the ALJ failed to discuss the aspect of Dr. Callis' opinions concerning Plaintiff's purported concentration, attention, and memory problems (Pl. Br.,ECF No. 18 at 25-26). Essentially, Plaintiff argues that the ALJ selectively extracted isolated evidence from the record which was unfavorable to her, rather than considering the entire record in context. The ALJ cannot just set out parts of an opinion and stop at that. The ALJ is prohibited from "cherry picking" the evidence, that is, he may consider and discount evidence contrary to his views, or consider it and adopt it, but he cannot simply ignore it and skip over it. The ALJ is obligated to consider all evidence, not just that which is helpful to his decision. Robinson v. Colvin, 2014 WL 4954709 (2014) (citing Gordon v. Schweiker, 725 F.2d 231, (4th Cir. 1984) and Murphy v. Bowen, 810 F.2d 433, 437 (4th Cir. 1987)).

However, "an ALJ is not required to provide a written evaluation of every piece of evidence, but need only 'minimally articulate' his reasoning." Jackson v. Astrue, No. 8:08–2855, 2010 WL 500449, at *10 (D.S.C. Jan. 19, 2010) (Mag. J.) (collecting authority from 7th, 8th, 10th and 11th Circuits), adopted by 2010 WL 500449 (Feb. 5, 2010). Additionally, "'an ALJ's failure to *cite* specific evidence does not indicate that it was not *considered.*'" *Id.* at *10 (emphasis added). As another court within the Fourth Circuit has explained, "an ALJ is not tasked with the 'impossible burden of mentioning every piece of evidence' that may be placed into the Administrative Record." Carringer v. Colvin, No. 2:13-cv-00027, 2014 WL 1281122, at *7 (W.D.N.C., March 27, 2014). The

---

evidence — both before and after her alleged onset date — in rendering her decision in this case (Tr. 17-21) (considering evidence from 2004 through 2012).  After careful review and consideration, and for the reasons set forth herein, substantial evidence supports the ALJ's findings and the ultimate conclusion that Plaintiff is not disabled as of the alleged onset date.

ALJ in this case fully considered all of the medical evidence of record including the entirety of Dr.

Callis' treatment records, as well as the findings of all of the other physicians, in considering Dr.

Callis' January 2008, January 2011 and August 2011 opinions. From the decision and the ALJ's

thorough discussion, it is evident that these records were considered in their entirety. Just because

the ALJ does not reach the conclusion that Plaintiff wishes based on the evidence of record, does not

mean that the ALJ placed reliance only on the portions of the record consistent with his findings,

with complete disregard for any other evidence. Few cases are without some conflicting evidence,

but the purview of this court is to review and determine if the Commissioner's findings are supported

by substantial evidence. Blalock, 483 F.2d at 775. Additionally, the ALJ in this case indicates

repeatedly that he has considered all of the evidence, and the entire record.   The court does not

conclude that the ALJ "cherry-picked" the evidence.

     Plaintiff cites several treatment notes in an effort to support her argument (Pl. Br., ECF No.

18 at 27), yet those records consist mostly of Plaintiff's own subjective complaints, which are not

medical findings. See, e.g., Smith, 2014 WL 1159056 at *3. The ALJ's analysis was in compliance

with the regulations and case law set forth above regarding physician opinion evidence.   While

Plaintiff may disagree with the ALJ's findings as to the opinion evidence, it is supported by

substantial evidence as outlined herein, and the court does not "reweigh conflicting evidence, make

credibility determinations, or substitute [its] judgment for that of the [ALJ]." Johnson, 434 F.3d at

653; see also Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) ("The ALJ may choose to give less

weight to the testimony of a treating physician if there is persuasive contrary evidence . . . ."). Where

conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the

responsibility for that decision falls on the [ALJ]." Johnson v. Barnhart , 434 F.3d 650, 653 (4th Cir.

2005).

Plaintiff's final allegation of error is that the ALJ erred in her credibility analysis. The ALJ considered and evaluated Plaintiff's subjective complaints, but did not find them to be fully credible. The ALJ must make a credibility determination based upon all the evidence in the record. Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir.1985).

It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision. SSR 96–7p.

Under Craig v. Chater, 76 F.3d 585, 591–96 (4th Cir.1996), subjective complaints are evaluated in two steps. First, there must be documentation by objective medical evidence of the presence of an underlying impairment that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Not until such underlying impairment is deemed established does the fact finder proceed to the second step: consideration of the entire record, including objective and subjective evidence, to assess the credibility of the severity of the subjective complaints. See also 20 C.F.R. § 404.1529(b); Social Security Ruling (SSR) 96–7p.

The ALJ may choose to reject a claimant's testimony regarding his pain or physical condition,

33

but he must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence. Hatcher v. Sec'y, Dep't of Health & Human Servs., 898 F.2d 21, 23 (4th Cir.1989) ( quoting Smith v. Schweiker, 719 F.2d 723, 725 n. 2 (4th Cir.1984)). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p.

Here, the ALJ accepted that Plaintiff had medically determinable impairments that could reasonably be expected to cause the alleged symptoms, but cited both objective and subjective evidence detracting from Plaintiff's statements regarding the extent of her limitations. (Tr. 30). The ALJ indicated that:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible for the reasons explained in this decision.

(Tr. 19).

Regarding the Plaintiff's credibility, the ALJ made these findings:

First, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The record shows that the claimant retains the ability for an impressive spectrum of activities of daily living, including driving several times per week; helping provide care for her epileptic husband; following television programming; preparing meals; doing at least occasional household chores; shopping in stores; and attending some church services. A treatment note from Dr. Callis, from September 26, 2008, also indicates that the claimant was well enough to take a month long trip to Maine from South Carolina. Although the ability to engage in such activities of daily living is not dispositive, it is demonstrative of greater ability than that alleged by claimant.

Second during the period in question, the record shows that the claimant has largely only treated with Dr. Callis, her primary care provider, with little treatment with relevant specialists. Moreover, at one point, Dr. Odom indicated that the claimant refused advanced pain management therapy he offered, on January 8, 2008, signifying the

34

claimant's failure to fully avail herself of all reasonably recommended treatment options. This evidence further weighs against the credibility of the claimant's allegations.

Next, as demonstrated above, the record shows that the claimant has no more than moderate limitation in the area of maintaining concentration, persistence, and pace. For example, currently, the claimant testifies that she is able to drive, despite reporting significant memory loss. Moreover, despite reporting these problems to Dr. Callis, he has never prohibited her from driving, which reasonably suggests that he does not consider this issue too significant. It should be noted that the claimant drives for her epileptic spouse.

Lastly, the medical evidence of record establishes that, with appropriate medicinal compliance, the claimant's impairment's can be easily controlled with mere conservative treatment. This, these various factors, when considered together and in light of the overall evidentiary record, completely erode the veracity of the claimant's subjective allegations and render them incredible.

(Tr. 19-20).

Initially, the ALJ noted the wide range of daily activities Plaintiff was able to perform, which were in stark contrast to her complaints of debilitating symptoms (Tr. 19). *See* 20 C.F.R. § 404.1529(c)(3)(I) (ALJ should consider activities of daily living in assessing credibility). As the ALJ pointed out, neither her physical nor mental conditions precluded her from caring for her epileptic husband on a daily basis, driving, which included concentrating well enough to ensure that he took his medication, make simple meals for him, and drive him places (Tr. 246). She drove a car about two or three times every week and drove herself to the administrative hearing (Tr. 80). She also performed occasional household chores, shopped in stores, and attended church (Tr. 246). In fact, in September 2008, Plaintiff told Dr. Callis that she was traveling from South Carolina to Maine for the entire month of October (Tr. 275). The ALJ found that these activities detracted from the credibility of her complaints about experiencing work-preclusive symptoms.

In addition to her daily activities, the ALJ also concluded that Plaintiff's relatively conservative treatment history further eroded the credibility of her allegations (Tr. 19). The ALJ

noted that Plaintiff had treated predominately with her primary care physician with little treatment from specialists, and refused at least one available treatment option recommended by Dr. Odom, who noted his concerns about Plaintiff's attitude toward treatment: "I'm not quite certain this patient has any desire whatsoever to get better" (Tr. 262).

The ALJ also noted that the objective medical evidence was inconsistent with Plaintiff's allegations of debilitating symptoms (Tr. 20). Both physical and mental examinations repeatedly showed that she was fully oriented; her neurological system was within normal limits with normal reflexes; she had no swelling, clubbing or deformity in her arms or legs; she had full strength in her motor system, arms, and legs; her stance and gait were normal; and, mentally, her affect, memory, concentration, and orientation were normal (Tr. 228-29, 245-46, 317, 321, 323, 326, 328, 332). Dr. Ramsey found Plaintiff had "no psychiatric diagnosis" (Tr. 247) and, consistent with that point, Plaintiff herself denied depression on numerous occasions (Tr. 244-45, 247, 269, 332, 357). Dr. Callis observed that she was "coping fairly well" with fibromyalgia (Tr. 277).

The ALJ also found it notable that, despite Plaintiff's allegations of concentration problems and memory loss, Dr. Callis never prohibited her from driving, which suggested that, from a medical standpoint, her condition was not as significant as she alleged (Tr. 19). As Plaintiff acknowledged, she drove two or three times a week and drove her epileptic husband places (Tr. 80, 246).

In light of the above, the undersigned concludes that the ALJ considered both objective and subjective evidence in making his credibility determination. Additionally, the ALJ's consideration indicates that he adequately considered how Plaintiff's impairments affected her routine. Courts have found that evidence of similar levels of activity tends to weigh against a finding of disability. See Johnson, 434 F.3d at 658 (ALJ properly found claimant's description of "excruciating" pain

36

inconsistent with her testimony that she cooked, cleaned the house, read, watched television, visited relatives, and attended church twice weekly); accord Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994); Gross, 785 F.2d at 1166. Because the record contains substantial evidence supporting the ALJ's conclusion about Plaintiff's limitations, the ALJ's credibility determinations are entitled to deference.

### III.  CONCLUSION

This court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. Richardson, 402 U.S. at 390. Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. Blalock, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the evidence, and this court cannot reverse that decision merely because the evidence would permit a different conclusion. Shively v. Heckler, 739 F.2d at 989. As previously discussed, despite the Plaintiff's claims, she has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, and pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631 (c) (3) of the Social Security Act, 42 U.S.C. Sections 405 (g) and 1338 (c) (3), it is, **RECOMMENDED** that the Commissioner's decision be **AFFIRMED**.

Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

November 30, 2015
Florence, South Carolina

37